An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-273

Filed 3 June 2026

Guilford County, No. 22CR075252-400

STATE OF NORTH CAROLINA

   v.

NYA JATOINE PITT


Appeal by Defendant from Judgment entered 30 September 2024 by Judge Tonia A. Cutchin in Guilford County Superior Court. Heard in the Court of Appeals 18 November 2025.


> *Attorney General Jeff Jackson, by Assistant Attorney General Andrew L. Hayes, for the State.*
>
> *Parry Law, PLLC, by Edward Eldred, for Defendant-Appellant.*


HAMPSON, Judge.


### Factual and Procedural Background

Nya Jatoine Pitt (Defendant) appeals from a Judgment entered pursuant to a jury verdict finding her guilty of Attempted First-Degree Murder. The Record before us, including evidence presented at trial, tends to reflect the following:

On 11 December 2023, Defendant was indicted on one count of Attempted

First-Degree Murder and one count of Assault With a Deadly Weapon With Intent to Kill Inflicting Serious Injury (AWDWIKISI). The charges arose from the shooting of Obrian Lee in Greensboro on 3 June 2022.

A jury trial began on 24 September 2024. The State called Obrian Lee as a witness. Lee testified, after finishing a day's work on 3 June 2022, he drove into the parking lot of his apartment complex. As he pulled in, Lee saw Defendant and Allen Perez standing outside his building. Lee lived in Apartment 22C on the second floor. Lee knew Defendant as the girlfriend of his neighbor Kayla. Defendant "stayed" with Kayla in Apartment 22F, which was across the hall from Lee's apartment.

Lee parked his car. He had his gun with him. Lee exited the car and walked to his trunk, from which he retrieved a bag containing his work tools and a shopping bag.

Defendant and Perez walked up to Lee. Perez had a gun. Defendant asked Lee, "what's the beef?" and Lee replied he had "no beef" with her. Perez "flashed" his gun at Lee; Lee showed his gun to Perez and Defendant. Defendant was unarmed.

Lee testified, after the encounter with Defendant and Perez in the parking lot, he walked to the stairs, took a few steps up, turned to look backward, and saw "[Perez] pass [his gun] to [Defendant]." When Lee "got to the top of the step[,]" Defendant's girlfriend, Kayla, came out of her apartment and "tr[ied] to calm everything down[.]" After briefly speaking with Kayla, Lee testified he "turned around to look, to face [Defendant]" and saw "the gun was already up in the air." Once at his door, Lee

testified he was facing away from Defendant when she shot him in the back. Lee was shot a total of nine times; bullets entered his back, chest, right arm, and both legs. He survived.

Alston Ray, a detective with the Greensboro Police Department (GPD) at the time of the shooting, gave testimony about interviews he conducted with Lee and Defendant during the police investigation. Det. Ray testified about the story Defendant told him during their interview:

> [Det. Ray]: [Defendant] claimed that Mr. Lee had a gun, that she was scared that [Lee] was going to shoot her, go in to his house and load his gun, and because of that she took a gun that Mr. Perez was holding at the time, pointing it at Mr. Lee, she took that gun from [Perez], and then took it upon herself to then shoot Mr. Lee and then went inside of the apartment.
>
> [The State]: So [Defendant] told you she shot [Lee] because she thought he was going to go inside to load the gun?
>
> [Det. Ray]: Yes[.]
>
> . . . .
>
> [The State]: Did [Defendant] say anything to you about [Lee] reaching for a gun before she shot him on his way into his apartment?
>
> [Det. Ray]: Not that I recall.

Defendant testified on the second day of trial. She stated she is five feet and three inches tall and was twenty-two years old at the time of the shooting. Defendant testified, around the time of the shooting, she "stayed at [Apartment] 22F[,]" her then-girlfriend Kayla's residence, and had "encounter[ed]" Lee at the apartment complex

prior to the shooting. Defendant testified her impression from these prior interactions with Lee, who is six feet four inches tall and weighs around 200 pounds, was that "he was very aggressive" and "intimidated" Defendant. However, she never had any "serious altercations" with Lee before the shooting.

Defendant testified that on the day of the shooting Lee "approache[d]" her and Perez as they were "trying to walk into the house." Lee "waved" at Defendant. Defendant confirmed she asked Lee, "what's the beef?" and Lee replied, "there is no beef."

Defendant testified Lee and Perez had words and drew their guns. The guns made Defendant feel "[s]cared[.]" Defendant testified the situation "deescalated and we start[ed] walking up the steps." Defendant "thought we were just going to go in the house . . . and [Lee] was going to go his way."

Defendant explained she followed Lee up the steps because she was going to Kayla's apartment and there was only one set of stairs. Defendant stated the situation was "simmering down," but when Kayla came out of her apartment, Lee became "more riled up and aggressive." Defendant testified Lee told Kayla, "she need to get her two bitches back in the house."

Defendant gave an account of events immediately before the shooting:

> [Defense Counsel]: Where is everybody physically situated at this moment?
>
> . . . .

[Defendant]: Me and Perez are standing by the fire extinguisher as well as Mr. Lee. We're all right there by the fire extinguisher.

. . . .

[Defense Counsel] All right. What happens next?

[Defendant] Then Mr. Lee proceeds to go into his home and he's act[ing] like he's putting his key into the door, but then he drops the keys into his left hand and goes to proceed as if he's going to grab a firearm.

[Defense Counsel]: Okay. So you said he turns like he's going to go inside?

[Defendant]: Yes.

[Defense Counsel]: But instead of that he reaches toward what?

[Defendant]: A firearm.

. . . .

[Defense Counsel]: In that moment what are you thinking? What are you feeling?

[Defendant]: I was scared. I was enraged. I thought if I turned around and went in the house that he would kill me so . . . in that instant I grabbed the gun from Perez and I shot twice.

When asked why she did not run into Kayla's apartment when she saw Lee reach for his gun, Defendant stated, "I thought I would be dead if I turned my back. [Lee] would have an advantage to shoot me with my back to him." Defendant testified, when she shot Lee, "I was just thinking about protecting myself from dying" and "I felt like I wasn't going to live if I didn't do it[.]"

After she fired at Lee twice, Defendant testified Lee "f[ell] to the ground" and

said, "stop, stop," at which point Defendant ceased firing, because "[Lee] couldn't harm [her] anymore." After Perez took the gun from her, Defendant testified she ran into Kayla's apartment, jumped off the balcony, and left.

On cross-examination, Defendant confirmed she was "terrified" when guns were drawn during the "first interaction down at [Lee's] car" with Perez. Defendant initially explained she followed Lee up the steps with Perez, rather than leave, "[b]ecause I stayed at [Apartment] 22F." The State inquired further into this decision:

> [The State]: [I]f you were truly terrified about this gun battle that was about to take place, why in the world would you not leave? Why did you continue to follow Mr. Lee up to his apartment?
>
> [Defendant]: Because I was scared of Perez.
>
> [The State]: So you didn't walk away because you were scared of Perez?
>
> [Defendant]: I was scared of everything that was going on at the time.

Defendant confirmed Lee did not have a gun in his hands as he walked up the steps, walked to his apartment, or while standing at his door. Defendant also confirmed that when Lee was trying to unlock his door, his gun was "in his waist" and he was "holding bags in his hands."

Regarding her interview with GPD, Defendant confirmed she did not tell the police "anything about [Lee] reaching for a gun" or "going for [his] gun" at his door. Defendant confirmed she told GPD she shot Lee because she thought he "was going to go inside his apartment, load this gun up and then come back outside and shoot

[her]." However, Defendant testified this was a lie, explaining she told GPD she feared Lee would load his gun and return to shoot her "only because I was scared . . . because Perez knew that I was talking to the detectives[.]" Defendant could not explain why her fear of Perez caused her to tell GPD this specific lie.

The State asked Defendant about Lee's actions and physical position when she shot him:

> [The State]: [Y]ou've said . . . that [Lee] was at his apartment door, that he was trying to open it up with a key; right?
>
> [Defendant]: Correct.
>
> [The State]: And then he set, for some reason, set the groceries down and then went for his gun?
>
> [Defendant]: No, I never said he set the groceries down. He still has stuff in his hands and then he reached for his pocket like he was going to reach for his gun and turn around and shoot and then go into the house.
>
> [The State]: Okay. . . . [S]o his back was to you. If he was opening the door his back was to you.
>
> [Defendant]: Correct.
>
> [The State]: So you shot him while his back was to you.
>
> [Defendant] Correct.

After Defendant finished her testimony, the defense rested.

During the charge conference, the parties requested various instructions from the North Carolina Pattern Jury Instructions (N.C.P.I.). Defense counsel requested "Voluntary manslaughter including self-defense, [N.C.P.I.] 206.40. The attempt for

the involuntary manslaughter."[1] The State objected "to the voluntary manslaughter instruction being given[,]" contending the facts did not "support[ ]" or "merit" giving the instruction.

Defense counsel argued, "[i]f the jury finds that [Defendant] acted in imperfect self-defense, then . . . the reduction would be an attempted voluntary manslaughter." After the State objected again, defense counsel added, "I believe [attempted voluntary manslaughter is] where we would land if the jury found self-defense but that [Defendant] had used excessive force or was the aggressor[.]"

The trial court reviewed N.C.P.I. 206.40. Defense counsel contended the instruction "is largely useful to us for its definition of imperfect self-defense." The trial court observed the first sentence of the pattern instruction's preliminary note states it is "designed for use" in cases where the "most serious homicide charge [is] of voluntary manslaughter." Defense counsel argued this sentence did not preclude use of the pattern instruction in other types of cases. The trial court denied defense counsel's requested instruction.

The trial court proposed, without objection, using "[N.C.P.I.] 206.17A, attempted first degree murder. That includes self-defense." After discussing

---

[1] The Transcript states defense counsel said, "the attempt for the involuntary manslaughter." From the surrounding context, it appears defense counsel may have misspoken by saying "involuntary," or the words may have been transcribed incorrectly. In any case, the parties and the trial court went on to discuss defense counsel's request as one for an instruction on Attempted Voluntary Manslaughter, a lesser-included offense of the charged crime of Attempted First-Degree Murder.

instructions on other issues, the trial court informed the parties it would work on the proposed instructions that evening and send them by email.

The next morning, the trial court asked the parties if they had "any requests or modifications" to the proposed instructions. The trial court granted defense counsel's request to be heard again on N.C.P.I. 206.40:

> [Defense Counsel]: Your Honor, I'll say the jury instruction for first degree murder with all lesser [included offenses] includes imperfect self-defense as a way to get to voluntary manslaughter. And I think the same should apply for an attempted first degree murder. . . . [C]onveniently[,] there is not an instruction for attempted first degree murder that includes all lesser included offenses. We just have that attempted first degree murder instruction. But attempted voluntary manslaughter is a lesser included [offense] of attempted first degree murder and the way that a jury would get to it would be through finding imperfect self-defense, specifically I think applicable to this case it would be finding that [Defendant] used excessive force. I think there's evidence in the trial [record] that supports the possibility that [the jury] could find [Defendant] used excessive force. Not allowing [the jury] that instruction wouldn't give them the option to find guilt on a lesser included [offense] that I think lines up with some of the evidence at trial and I think [the jury] should have that option.

The State opposed defense counsel's request, arguing "I don't think you can have an attempted voluntary manslaughter. . . . In addition to that, I don't think the facts in this particular case would lend to that type of crime[.]" In response, defense counsel noted, "the courts [have] recognized attempted voluntary manslaughter as a

defense[.]" The trial court denied defense counsel's requested instruction again.[2]

The trial court instructed the jury on Attempted First-Degree Murder and AWDWIKISI. The jury found Defendant guilty of both crimes. The trial court arrested judgment on the AWDWIKISI conviction and entered Judgment on the Attempted First-Degree Murder conviction. Defendant was sentenced to 157 to 201 months' imprisonment. Defendant gave oral Notice of Appeal in open court.

## Issue

The issue on appeal is whether the trial court erred by denying Defendant's request for a jury instruction on Attempted Voluntary Manslaughter.

## Analysis

Defendant argues the trial court committed prejudicial error in denying her request for an instruction that would have "given the jury the opportunity to find [her] guilty of attempted voluntary manslaughter."

Attempted voluntary manslaughter (AVM) is a lesser-included offense of attempted first-degree murder. *State v. Rainey*, 154 N.C. App. 282, 290-91, 574 S.E.2d 25, 30, *disc. review denied*, 356 N.C. 621, 575 S.E.2d 520 (2002). As Defendant points out, however, the North Carolina Pattern Instruction for attempted first-degree murder does not list AVM as a lesser-included offense. *See* N.C.P.I.-Crim. 206.17A. On appeal, Defendant contends, "[n]evertheless, because the evidence would have

---

[2] Before the charge conference concluded, defense counsel "renew[ed] [the] request for the lesser included offense of attempted voluntary manslaughter for the record."

supported a rational juror's finding that [she] committed the lesser [included] offense of [AVM,]" the trial court was required to give an instruction on AVM. Defendant specifically asserts her trial counsel's request to "tailor" the attempted first-degree murder pattern instruction by modifying it to include a definition of imperfect self-defense from a Voluntary Manslaughter pattern instruction, N.C.P.I.-Crim. 206.40, constituted a request for an instruction on AVM based on imperfect self-defense. On the ground of this asserted error, Defendant asks this Court to order a new trial.

Although neither party raises this issue, we note Defendant's trial attorney solely made oral requests for a modification of the attempted first-degree murder pattern instruction to include the lesser-included offense of AVM based on imperfect self-defense.[3] A request for an instruction which deviates from the pattern jury instruction qualifies as a request for a special instruction. *State v. Young*, 294 N.C. App. 518, 524-25, 903 S.E.2d 460, 465 (2024) (citations omitted); *accord State v. McNeill*, 346 N.C. 233, 239-40, 485 S.E.2d 284, 288 (1997) (oral requests to modify pattern instructions for premeditation and deliberation "were tantamount to a

---

[3] As stated, we consider Defendant's trial counsel's requests as seeking, in effect, a modification of the attempted first-degree murder pattern instruction, N.C.P.I.-Crim. 206.17A, which the parties agreed upon without objection, to include the lesser-included offense of AVM based on imperfect self-defense. It would also be reasonable to say defense counsel asked the trial court to create a new AVM instruction by borrowing a definition of imperfect self-defense from N.C.P.I.-Crim. 206.40. Whatever specific form of instruction defense counsel had in mind, a request to deviate from a pattern instruction is a request for a special instruction, *see Young*, 294 N.C. App. at 524-25, 903 S.E.2d at 465, such requests must be in writing, *see Harris*, 47 N.C. App. at 123, 266 S.E.2d at 737, and the trial court "is not required to compose the words of a request for a special instruction[,]" *State v. Wester*, 71 N.C. App. 321, 329, 322 S.E.2d 421, 425 (1984).

request for special instructions"). "Requests for special instructions must be in writing and must be submitted before the beginning of the charge by the court." *State v. Harris*, 47 N.C. App. 121, 123, 266 S.E.2d 735, 737 (1980) (citations omitted). Our Supreme Court has held that a trial court's ruling denying requested special instructions is not erroneous where the defendant fails to submit the requested instruction in writing. *See State v. Martin*, 322 N.C. 229, 236-37, 367 S.E.2d 618, 622-23 (1988) (defendant failed to request special instruction in writing and, therefore, the issue was not preserved on appeal, and the trial court did not err in failing to give the requested instruction in the absence of a written request); *McNeill*, 346 N.C. at 240, 485 S.E.2d at 288 ("Defendant here did not submit either of his proposed modifications in writing, and therefore it was not error for the trial court to fail to charge as requested.").

However, this Court has addressed a defendant's substantive arguments regarding requested special instructions even where, as here, the defendant did not submit the requested instruction to the trial court in writing. *E.g.*, *Young*, 294 N.C. App. at 528-31, 903 S.E.2d at 467-69; *State v. Craig*, 167 N.C. App. 793, 795-97, 606 S.E.2d 387, 388-89 (2005). As we explained in *State v. Mewborn*,

> [w]here a requested [special] instruction is not submitted in writing and signed pursuant to [N.C. Gen. Stat. §] 1-181, it is within the discretion of the [trial] court to give or refuse such instruction. . . . [A]ccordingly, our standard of review is abuse of discretion. If we find the trial court abused its discretion, defendant is entitled to a new trial only if there is a reasonable probability that, had the abuse of discretion not occurred, a

different result would have been reached at trial." 178 N.C. App. 281, 292, 631 S.E.2d 224, 231 (2006) (citations and quotation marks omitted). Accordingly, we will address Defendant's substantive arguments about the requested instruction despite her failure to submit it to the trial court in writing.

"An instruction on a lesser-included offense must be given only if the evidence would permit the jury rationally to find [the] defendant guilty of the lesser offense and to acquit him of the greater." *State v. Millsaps*, 356 N.C. 556, 561, 572 S.E.2d 767, 771 (2002) (citation omitted). "[W]here a specifically requested jury instruction is proper and supported by the evidence, the trial court must give the instruction, at least in substance[.]" *State v. Augustine*, 359 N.C. 709, 729, 616 S.E.2d 515, 529-30 (2005) (citation and quotation marks omitted).

Here, Defendant contends that because "[a] rational juror could have found [she] acted in imperfect self-defense[,]" a jury instruction on AVM on the basis of imperfect self-defense was required. We disagree. Even if Defendant had properly requested a special instruction in writing, we conclude the evidence would not have supported giving it.

"To show an 'attempt' crime, the State must show (1) the intent to commit the substantive offense, and (2) an overt act done for that purpose which goes beyond mere preparation, but (3) falls short of the completed offense." *State v. Guin*, 282 N.C. App. 160, 166, 870 S.E.2d 285, 290 (2022) (citation and quotation marks omitted). "Voluntary manslaughter is the intentional, unlawful killing of a human being either:

(1) perpetrated by reason of sudden anger or 'heat of passion' that temporarily removes reason and malice or (2) a premeditated and deliberated first-degree murder or second-degree murder for which the defendant has an imperfect right to self-defense." *State v. Hairston*, 269 N.C. App. 52, 57, 837 S.E.2d 157, 162 (2019) (citation and quotation marks omitted). "If the defendant was the aggressor or used excessive force, he has lost the benefit of perfect self-defense but may be entitled to the defense of imperfect self-defense." *State v. Simmons*, 167 N.C. App. 512, 520, 606 S.E.2d 133, 138 (2004) (citation omitted).

Defendant contends she was entitled to an instruction on AVM under a theory of imperfect self-defense. *Compare State v. Lea*, 126 N.C. App. 440, 447-48, 485 S.E.2d 874, 878-79 (1997) (analyzing entitlement to AVM instruction on basis of evidence of imperfect self-defense) *with Rainey*, 154 N.C. App. at 290-91, 574 S.E.2d at 30-31 (analyzing entitlement to AVM instruction on basis of evidence of "heat of passion" or "provocation"). "In order for an instruction on imperfect self-defense to be required, the first two elements of perfect self-defense must be shown to exist." *State v. Wallace*, 309 N.C. 141, 149, 305 S.E.2d 548, 553 (1983) (citation omitted). The first two elements of perfect self-defense are:

> (1) it appeared to defendant and he believed it to be necessary to kill the [victim] in order to save himself from death or great bodily harm; and
>
> (2) defendant's belief was reasonable in that the circumstances as they appeared to him at the time were sufficient to create such a belief in the mind of a person of ordinary firmness[.]

*State v. Bush*, 307 N.C. 152, 158-59, 297 S.E.2d 563, 568 (1982) (citation and quotation marks omitted). Thus, "when there is no evidence from which a jury could reasonably find that [the] defendant, in fact, believed it necessary to kill his adversary to protect himself from death or great bodily harm, [the] defendant is not entitled to have the jury instructed on [imperfect] self-defense." *State v. Harvey*, 372 N.C. 304, 308, 828 S.E.2d 481, 484 (2019) (citation and quotation marks omitted). In determining whether a self-defense instruction must be given, "the evidence is to be viewed in the light most favorable to the defendant." *State v. Moore*, 363 N.C. 793, 796, 688 S.E.2d 447, 449 (2010) (citation omitted).

Here, the evidence viewed in the light most favorable to Defendant does not support her claim she believed it was necessary to use deadly force against Lee in order to protect herself from death or great bodily harm. *See Harvey*, 372 N.C. at 308, 828 S.E.2d at 484. Even if Defendant sincerely formed this belief, it was not reasonable, because the circumstances were not sufficient to create it in the mind of a person of ordinary firmness. *See Bush*, 307 N.C. at 158-59, 297 S.E.2d at 568.

We first observe the evidence about the events in the parking lot and on the stairs does not show Defendant believed Lee posed a threat to her life. Defendant testified Lee initially waved at her. She then asked Lee, "what's the beef[,]" which meant she wanted to find out whether they had a "problem"—but Lee responded they had "no beef." When Lee and Perez drew their guns, Defendant testified she felt

scared. However, the situation deescalated; Lee put his gun away and walked toward the staircase. Defendant testified Lee did not have his gun out while walking up the steps or to his door on the second floor. Further, Defendant gave two different explanations for her decision to follow Lee up the stairs with Perez: (1) she was going to Kayla's apartment on the same floor; and (2) she was "scared of Perez" and "scared of everything that was going on at the time." Assuming Defendant's first explanation is true, any fear she had of Lee did not stop her from following him up the stairs to go to Kayla's neighboring apartment. Assuming her second explanation is true, Defendant's testimony indicates she was afraid of Perez and "everything . . . going on at the time"—but it does not suggest she feared *Lee* was a threat to her life. In either case, the evidence does not show Lee's actions in the parking lot or during his walk up the steps to his door caused Defendant to believe he would kill her or inflict great bodily harm. *See Harvey*, 372 N.C. at 308, 828 S.E.2d at 484.

Next, as to the evidence of Defendant's state of mind when she used deadly force, Defendant testified she saw Lee reach for his gun as he stood at his door, which made her fear for her life, so she "grabbed the gun from Perez" and shot twice. However, this account was undercut by other evidence, namely Defendant's own testimony stating: (1) Lee did not have a gun in his hands on the stairs or at his door; (2) Lee's gun was "in his waist" when he was at his door; (3) Lee was trying to turn his key to open his door; (4) Lee was holding bags at his door; and (5) in her interview with GPD, she did not mention fearing Lee would reach for his gun but rather said

she shot Lee because she was afraid he would enter his apartment, load his gun, and return to shoot her. Especially in light of this countervailing evidence, Defendant's "self-serving statement[s] that [s]he was 'scared' " that Lee would reach for his gun and shoot her "is not evidence that [D]efendant formed a belief that it was necessary to kill in order to save [her]self." *State v. Lyons*, 340 N.C. 646, 662, 459 S.E.2d 770, 779 (1995) (citation omitted). *See also Bush*, 307 N.C. at 159-60, 297 S.E.2d at 568 (defendant's "self-serving statements that he was 'nervous' and 'afraid' " merely indicated "some vague and unspecified nervousness or fear" and did not amount to evidence defendant "had formed any subjective belief" it was necessary to kill the victim to save himself from death or great bodily harm). Additionally, the evidence indicated Lee, facing away from Defendant, was trying to enter his home and end the interaction. At the same moment, Defendant was standing near Kayla's apartment, in which she resided. Thus, like Lee, Defendant presumably could have tried to retreat to a place of greater safety.[4] These circumstances show Defendant had a "reasonable opportunity to alleviate the danger to [herself] . . . without resorting to deadly force[,]" but instead she shot at Lee twice. *Lea*, 126 N.C. App. at 448, 485 S.E.2d at 879.

Finally, Defendant confirmed she shot Lee "while his back was to [her]." The

---

[4] Indeed, Defendant's testimony that, after Perez took the gun from her, she ran into Kayla's apartment and jumped off the balcony indicates Kayla's apartment was available to Defendant as a place of safety at the moment she decided to shoot Lee.

act of shooting a victim in the back undermines a defendant's claim that he used deadly force in the exercise of self-defense. *See State v. Rush*, 340 N.C. 174, 186, 456 S.E.2d 819, 826 (1995) ("We also note that the fact that the victim had been shot in the back of the head, and thus could not have been facing defendant when he was shot, strongly negates any theory of self-defense."); *State v. Exxum*, 338 N.C. 297, 300, 449 S.E.2d 554, 555-56 (1994) (defendant was not entitled to instruction on voluntary manslaughter based on imperfect self-defense in part because "undisputed evidence showed that defendant shot the victim in the back as the victim was walking away from defendant").

Thus, based on the evidence at trial, "[w]e conclude that no one of ordinary mental firmness could reasonably believe" deadly force was necessary in order for Defendant "to save [herself] from death or great bodily harm[.]" *Lea*, 126 N.C. App. at 448, 485 S.E.2d at 879 (citation, quotation marks, and brackets omitted). Therefore, the evidence did not support giving an instruction on AVM based on imperfect self-defense. *See Harvey*, 372 N.C. at 308, 828 S.E.2d at 484. Consequently, because the evidence would not permit a rational jury to find Defendant guilty of the lesser-included offense of AVM and acquit on the greater charged offense of Attempted First-Degree Murder, *see Millsaps*, 356 N.C. at 561, 572 S.E.2d at 771, the trial court did not abuse its discretion by refusing to give a special instruction orally requested by Defendant's trial counsel, *see Mewborn*, 178 N.C. App. at 292, 631 S.E.2d at 231.

## <u>Conclusion</u>

Accordingly, for the foregoing reasons, we conclude there was no error at Defendant's trial and affirm the Judgment.

NO ERROR.

Judges ARROWOOD and COLLINS concur.

Report per Rule 30(e).